# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JODY BENNINGER,** | : | **Bankruptcy No. 05-31181 JAD** |
| | : | |
| **Debtor.** | : | **Chapter 13** |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | **X** | |
| | : | |
| **JODY BENNINGER,** | : | **Related to Document No.  43** |
| | : | |
| **Movant,** | : | |
| | : | |
| **- vs -** | : | |
| | : | |
| **FIRST COLONY LIFE INSURANCE** | : | |
| **COMPANY, COMMONWEALTH OF** | : | |
| **PENNSYLVANIA MEDICAL** | : | |
| **PROFESSIONAL LIABILITY** | : | |
| **CATASTROPHE LOSS FUND, ALBERT E.** | : | |
| **CUNEO, and RONDA J.  WINNECOUR,** | : | |
| **Chapter 13 Trustee.** | : | |
| | : | |
| **Respondents.** | : | |
| | : | |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | **X** | |
| | : | |
| **JODY BENNINGER,** | : | **Related to Document No.  65** |
| | : | |
| **Movant,** | : | |
| | : | |
| **- vs -** | : | |
| | : | |
| **ALBERT E.  CUNEO.** | : | |
| | : | |
| **Respondent.** | : | |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | **X** | |

Appearances:  Gary Simone - Attorney for Chapter 13 Debtor
               Albert E. Cuneo - *pro se*

## MEMORANDUM OPINION (A) SUSTAINING OMNIBUS OBJECTION TO ALL PROOFS OF CLAIM FILED BY  ALBERT E.  CUNEO AND (B) GRANTING MOTION TO RELEASE FUNDS

There are two matters before the Court, each of which have been consolidated for purposes of this Memorandum Opinion.  These two matters are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), (K) and (O).  The first matter is the debtor's Motion to Release Funds Held by First Colony Life Insurance Company (the "Motion to Release Funds").  The second matter is the debtor's Objection to All Proofs of Claim filed by Albert E.  Cuneo (the "Claims Objection").  The issues raised by the Motion to Release and the Claims Objection are: Does Albert Cuneo hold any allowable unpaid claims against the debtor, Jody Benninger?  If Mr. Cuneo does hold allowed claims, are such claims properly secured against the debtor's interest in a pre-bankruptcy structured settlement of a medical malpractice action?  For reasons set more fully in this Memorandum Opinion, the Court concludes that Mr. Cuneo has no unpaid claims that are allowed.  For the same reasons why Mr. Cuneo has no unpaid claims that are allowed, the Court also concludes that Cuneo has no security interest whatsoever in any of the debtor's assets.  Consequently, the Court will enter an order which (a) grants the Motion to Release Fund, and (b) sustains the Claims Objection.

## I.  **BACKGROUND**

The claimant in these proceedings, Albert E. Cuneo, filed nine (9) separate secured claims against the bankruptcy estate, each arising out of an "Agreement" dated July 14, 2000 for "Consultation Services" by and between the  Debtor and Mr. Cuneo.  The following is a summary of the proofs of claim filed by Albert E.  Cuneo:

| Proof of Claim | Alleged Basis of Claim | Judgment Obtained | Claim Amount |
|---|---|---|---|
| #6 | Services Rendered 6/29/00 - 8/8/00 | 8/09/00; Butler County, PA 2000-20766 | $2,469.03 |

| (...continued) Proof of Claim | Alleged Basis of Claim | Judgment Obtained | Claim Amount |
|---|---|---|---|
| #7 | Services Rendered 8/9/00 - 9/4/00; | 9/05/00; Butler County, PA 2000-20872 | $2,569.97 |
| #8 | Services Rendered 9/05/00 - 10/11/00 | 10/11/00; Butler County, PA 2000-20988 | $1,957.07 |
| #9 | Commission on annuity proceeds transfer to Settlement Capital | 4/30/02; Butler County, PA 2002-20610 | $28,850.77 ($267, 836.00 x 7% = $18,748.52 plus interest) |
| #10 | Services Rendered 10/01/00-11/30/00 | 05/01/02; Butler County, Pa 2002-20613 | $2,440.94 |
| #11 | $100 court ordered counsel fee payable to Cuneo | 01/21/05; Butler County, PA 2005-20161 | $387.88 |
| #12 | Commission of 7% based on theory of loss of bargain (rate Cuneo believes should have been utilized)- first transfer to Settlement Capital | 8/15/05; Butler County, PA 2005-21583 | $11,286.72 ($7,373.88 principal plus $3,838.63 interests plus costs) |
| #13 | Commission of 7% based on theory of loss of bargain (rate Cuneo believes should have been utilized) - second transfer to Settlement Capital | 8/15/05; Butler County, PA 2005-21584 | $47,297.60 ($38,578.70 principal plus $8,502.39 plus costs) |

| (...continued) Proof of Claim | Alleged Basis of Claim | Judgment Obtained | Claim Amount |
|---|---|---|---|
| #14 | Lawsuit against Benninger, Butler County, PA 2003-10409 | n/a | unliquidated |
|  |  |  |  |
| TOTAL |  |  | $97,259.98 |
|  |  |  |  |

The circumstances giving rise to the Debtor's contractual relationship with Mr. Cuneo are unfortunate. In 1979, the debtor Jody Benninger (then known as Jody Frank)(hereinafter referred to as the "Debtor" or "Benninger") gave birth to a son, Jason, who was born prematurely with brain damage and cerebral palsy. Jason Frank remained in the hospital after his birth for approximately one year. Thereafter, he required assistance in all aspects of his life. Jason ultimately passed away on April 5, 1998 at the age of 18.

In 1982, a medical malpractice action was commenced against Benninger's physician on behalf of Benninger's minor severely disabled son, as well as on behalf of Benninger and her then husband in the Court of Common Pleas of Butler County. The action alleged negligence occurring before and at the time of Jason's birth. According to papers filed in the Court of Common Pleas of Butler County, Jason was mentally and physically disabled from birth, having suffered brain damage, spastic athetoid cerebral palsy and related disorders.

A settlement was reached in 1986 in which a structured settlement was established for the benefit of the guardianship estate of Jason Frank. As part of the settlement, a lump sum payment

of $140,000 was made for Jason Frank's benefit.  To fund the structured settlement, an annuity was purchased on behalf of Jason Frank in the amount of $310,000 to provide an annual income of $20,760.00 payable for a period of thirty years.  An additional annuity was also purchased to provide deferred lump sum payments every five years commencing in February 1992 in a scheduled amount.[1]  Both annuities were purchased by the Medical Professional Liability Catastrophe Loss Fund from First Colony Life Insurance Group.

Prior to her son's death in 1998, Debtor Jody Benninger took care of her two daughters along with her son Jason (who required constant care).  At all times material hereto, Benninger did not have employment outside of the home.  In terms of education, the Debtor completed her high school education but did not obtain any education beyond a high school diploma.  In June 1998, Benninger and her husband were officially divorced.[2]

After the death of her son, Benninger was a "nervous wreck."  Her condition was such that she was under the care of a treating physician, and was on prescription medication (Xanax). During this time frame, the Debtor began to experience financial difficulties.

As a result of Benninger's financial problems, she sought to sell her home in hopes of avoiding a sheriff's sale.  Towards this end, Benninger contacted Northwood Realty seeking a realtor to list her home for sale.  Benninger came into contact with the respondent Albert E. Cuneo ("Cuneo") through Northwood Realty because, at that time, Cuneo was a real estate agent for the company.

---

[1] The schedule of payments was as follows: February 1992 - $25,000; February 1997 - $50,000; February 2002 - $100,000; February 2007 - $200,000; February 2012 - $250,000; and February 2017 - $500,000.  Resp. Ex. 6.

[2] Benninger entered into a settlement with her ex-husband regarding the annuity payments.  Pursuant to the settlement, Benninger's ex-husband accepted a fixed dollar amount from the annuity proceeds in the amount of $6,000. Resp. Ex. 5, Estate Agreement.

In an effort to alleviate financial burdens that had developed, Benninger also determined to sell her interests in the structured settlement funded by the annuities issued by the First Colony Life Insurance Group.  She made this decision after seeing a television advertisement for Peachtree Settlement Funding ("Peachtree"), which is a company that is in the business of purchasing structured settlements.  At the time of the advertisement, Benninger had already received a notice of foreclosure against her home.  She made the initial contact with Peachtree after seeing the advertisement in hopes of receiving sufficient funds to satisfy her mortgage and other debts.  After she made contact with Peachtree, Benninger then filled out some type of contract with Peachtree in order to commence the process whereby the structured settlement could be sold.

After Benninger commenced discussions with Peachtree, Cuneo became aware of Benninger's beneficiary rights to receive the annuity payments and her desire to liquidate them.  It is not entirely clear to the Court how this fact became known to Cuneo.  It also did not appear to be clear to Benninger, who testified that possibly Cuneo saw her filling out applications for the transfer of the structured settlement funded by the annuities or that he overheard phone conversations that she was having concerning the potential transfer of the right to payments.[3]  No matter how Cuneo became aware of the possible transaction, it is undisputed in this case that Benninger had initiated contact with Peachtree on her own without the assistance of Cuneo and that Cuneo interjected himself into the process after-the-fact.

After meeting with Benninger, Cuneo drafted an "Agreement", dated July 14, 2000, for "Consultation Services".  It is important to note that the Agreement is an eight page, single spaced,

---

[3] Cuneo testified that he learned of Benninger from a third party who indicated that she was interested in liquidating portions of an annuity contract.  Cuneo then initiated contact with her for the purpose of discussing the annuity.  Benninger was not sure how soon after she had started communicating with Peachtree that Cuneo entered the picture.

thirty-seven (37) paragraph long document that is chocked full of legalese that can make a Byzantine scholar proud. The Agreement, which is not written in plain English,  contains countless references throughout to "the party of the first part" (Cuneo) and "the party of the second part" (Benninger) which causes much difficulty of comprehension.  Even upon a review of the Agreement, it is quite understandable that Benninger may not have understood it.  Much of the legalese would be difficult for a trained legal professional to decipher let alone a lay person, particularly one in a heightened emotional and medicated state such as Benninger.  Buried within lengthy paragraphs overflowing with "heretos," "hereins" and "parties of first and second parts," is the Agreement's imposition of significant obligations on Benninger and the limitation of her rights.

The Agreement states that Cuneo agreed to provide the following services to or for the benefit of Benninger: "rendering of advise and professional expertise for the purpose of asset liquidation, debt consolidation and restructuring, investment or re-investment of capital in real person, or business property."[4]  As payment for these services, Cuneo developed a payment scheme based on hourly rate and/or a percentage commission.  Specifically, Cuneo charged Benninger for consultation and administrative services in the amount of $150.00 an hour on the basis of .10 per hour increments.[5] As to any proceeds that Benninger might receive as a result of "consultations, projections, or financial information disseminated" by Cuneo, Cuneo was to receive a  percentage commission of seven per cent (7%).[6]  In addition, the Agreement provided for reimbursement of all fees and costs plus a 10% advance fee (i.e., a 10% mark-up) on all costs.  Unpaid amounts accrued

---

[4] Agreement, ¶A.2.

[5] Id., ¶B.11.

[6] Id., ¶B.12.

interest at an annual rate of 10% compounded on a daily basis.[7]

Among the significant provisions in the Agreement was a provision that allegedly provides Cuneo a security interest in the annuity funded structured settlement.[8] The Agreement further called for Benninger to execute notes for amounts payable to Cuneo.[9] In addition, the Agreement provided for Cuneo, if he so chose, to confess judgment for all sums due from Benninger.[10] The way the Agreement worked was that Cuneo could proceed to confess judgment(s) against Benninger, rather than place a mortgage or financing statement against Benninger's property, in order to "protect the annuity from infiltration."

Upon entering into the Agreement (and even before hand), Cuneo began charging Benninger for services relating to a variety of matters, many of which appear to be legal in nature.  These matters include Cuneo providing "consultation" services with respect to the pending mortgage foreclosure against Benninger, Cuneo negotiating and/or providing consultation services with respect to the workout of delinquent loans, and Cuneo providing consultation with respect to the eviction of an "undesirable individual" residing on the Debtor's property.

Additional alleged services provided by Cuneo included the preparation of an "application" with respect to Benninger's sale of the structured settlement.   Apparently, sometime at or about the time Benninger entered into the Agreement with Cuneo, Peachtree learned that Pennsylvania law required that the sale of structured settlements must be approved by the Court of Common Pleas.

---

[7] Id., ¶B.16.

[8] Id., ¶B.16.

[9] Id.

[10] Id. ¶33.e.

Peachtree advised Benninger that Peachtree was not interested in engaging in certain legal proceedings required to conclude the sale of the structured settlement. Peachtree then subsequently referred Benninger to Settlement Capital Corporation ("Settlement Capital"). In August, 2000, Benninger submitted a written application to Settlement Capital seeking to sell her annuity rights under the structured settlement. It is this application to Settlement Capital that was typed and mailed by Cuneo.

In the months following the signing of the Agreement, Cuneo proceeded to obtain judgment notes executed by Benninger for alleged services rendered by Cuneo. Cuneo then confessed judgment on the notes in the Court of Common Pleas of Butler County. Specifically, a note dated August 3, 2000 in the principal amount of $7,881.38 was executed by Benninger in favor of Cuneo for alleged services rendered from and after June 29, 2000 and this note was the basis for a confession of judgment on August 9, 2000 at Case No. 2000-20766 in the Court of Common Pleas for Butler County, PA. The judgment by confession at Case No. 2000-20766 was entered less than one month after the execution of the Agreement. The amount allegedly due included charges for "services" rendered prior to the date of the Agreement.

Less than one month later on September 5, 2000, another judgment by confession was entered at Case No. 2000-20872 in the Court of Common Pleas of Butler County based upon a note dated August 31, 2000 in the principal amount of $9,980.75. This note was allegedly for sums due on account of services rendered by Cuneo from approximately August 9, 2000 to September 4, 2000.

Only five weeks later, another note in the amount of $1,926.56 for services rendered from approximately September 5, 2000 to October 11, 2000, was executed by Benninger in favor of

Cuneo.  On the same date, Cuneo also confessed judgment against Benninger at Case No. 2000-20988 in the Court of Common Pleas of Butler County, PA.

In order to pursue collection of his confessed judgments, Cuneo hired counsel in Virginia, which is the location of First Colony Life Insurance Company.  Through Virginia counsel, Cuneo allegedly garnished the annuity payments made from First Colony Life Insurance Company to Benninger.[11] As a result of the garnishment,  Cuneo has received, to date, a sum excess of $23,000.

According to various proofs of claim filed by Cuneo in this bankruptcy case, Cuneo also obtained additional confessed judgments against Benninger in the Court of Common Pleas of Butler County.[12]  These judgments are: a judgment in the amount of $18,748.52 entered on April 30, 2002 (Proof of Claim No. 9), a judgment in the amount of $1,336,67 entered May 1, 2002 (Proof of Claim No. 10),  judgment in the amount of $7,373.88 entered on August 15, 2005 (Proof of Claim No. 12) and finally, judgment in the amount of $38,578.70  (Proof of Claim No. 13). The proofs of claim do not provide the substantive basis for these alleged judgments.

Although the parties had apparently entered into a listing agreement to sell Benninger's house, no private sale of the house occurred and the Benninger's house was ultimately subject to a sheriff's sale.  Communications between Benninger and Cuneo then stopped sometime around the beginning of 2001, and it therefore appears that Benninger did not execute any judgment notes with respect to any of the debts underlying the claims filed by Cuneo at Claim Nos. 9, 10, 11, 12, 13 and 14.

---

[11] Cuneo did not put into evidence any documentation supporting the garnishments, and the Court is without any evidence upon which it can conclude that the garnishments were valid.

[12] See also Motion for Relief From Automatic Stay and Adequate Protection [Docket No. 33, filed on October 20, 2005] at ¶¶9 and 9(a) through 9(e).

After the cessation of communication between the parties, a joint petition was submitted on

April 16, 2001 by Benninger and Settlement Capital in the Court of Common Pleas of Butler County

seeking approval for the transfer of certain of Benninger's rights under the annuity funded structured

settlement (in exchange for the sum of $246,770.00).[13]   The petition was submitted pursuant to 40

P.S. §4003, which sets forth "Conditions to Transfers of Structured Settlement Payment Rights."

The petition was approved by the Court of Common Pleas of Butler County on May 30, 2001.

Cuneo was not involved in the preparation, submission or approval of the joint petition submitted

to the court.

When he entered into the "Agreement" for "Consultation Services" with Benninger, Cuneo

failed to file a UCC-1 financing statement to perfect any security interest granted to him.   However,

belatedly and after his relationship with Benninger ended, Cuneo filed a UCC-1 Financing Statement

on March 25, 2002 with the Pennsylvania Secretary of State (naming Benninger, First Colony Life

Insurance Company and Medical Professional Liability Catastrophe Loss Funds as debtors).   The

UCC-1 financing statement was not signed by Ms. Benninger or any of the other persons or entities

listed as "debtors."

In April 2003, a second joint petition to transfer Benninger's rights to the annuity payments

was submitted to the Court of Common Pleas for Butler County by Benninger and Settlement

Capital.  Pursuant to the second petition, Benninger sought to transfer her rights to receive certain

annuity payments to Settlement Capital for $168,000.00.[14]  A final order approving the second joint

---

[13] Benninger received the sum of $246,770.00 in exchange for transferring her rights to receive: (a) periodic
monthly payments of $1,650.00 commencing May 2001 through April 2011 and (b) lump sum payments of
$100,00.00 in February 2002 and $200,000.00 in February 2007.

[14] In exchange for selling her rights to receive periodic monthly payments of $100 of all monthly payments
(continued...)

petition was entered on September 2, 2003.  Cuneo was not involved in any way with this second

joint petition and acknowledged at trial that he had no knowledge of the petition.

Benninger's financial malaise continued and ultimately she filed her Chapter 13 petition on

August 29, 2005.  No explanation has been provided to the Court in terms of exactly what happened

to the sale proceeds Benninger received from Settlement Capital.

Because Cuneo's garnishments had effectively tied up all remaining funds payable by First

Colony to the Debtor, Benninger filed the Motion to Release Funds.  In the Motion to Release

Funds, Benninger asserted that the proceeds of the annuity issued by First Colony[15] are property of

the estate and that such proceeds are essential to the Debtor's funding of her Chapter 13 plan.  The

motion therefore requested that First Colony release all funds being held as well as any future

payments due to be paid to the Debtor.[16]  A hearing was held on December 6, 2005 at which it was

determined that an evidentiary hearing would be set and the Debtor would file a formal objection

to Cuneo's proofs of claims.

---

[14](...continued)
commencing July 1, 2003 through April 2011, $1,750.00 commencing May 2011 through January 2017 and to
receive $247,125.06 of the lump sum payments of $250,00.00 in February 2012 and $500,000.00 in February 2017,
Benninger received the sum of $168,000.00.

[15]   Benninger sold her right to virtually all of the lump sum deferred payments and a portion of each
monthly payment she is entitled to until 2017.   The annuities funded by First Colony that were not sold are: the
remaining portions of each monthly payment net of the $1,750.00/month sale to Settlement Capital. The remaining
monthly amount will increase each year based upon an annuity schedule which provides for a 3%  increase
compounded annually.  Beginning in 2001, the year of the first transfer to Settlement Capital, the gross monthly
amount Benninger was to receive was $2,616.78.  In 2016, the last year Benninger is to receive any payments, the
total monthly amount she is to receive is $4,076.86.  Accordingly, Benninger will continue to receive a net monthly
amount of approximately $1,283.57 in 2006 increasing up to approximately $2,326.86 in 2016. Resp. Ex. 13, Ex. C
to Purchase and Sale Agmt., p. 3.

[16] In July, 2005 First Colony Life Insurance Company ceased disbursing payments to the Debtor.
Benninger asserts that the cessation was "by reason of the insurance company's investigation of a creditor, in the
case, Albert Cuneo, and the propriety of his attachment of those proceeds in the past." Document, No. 43, Motion to
Release Funds, ¶7.

00000271.WPD

Shortly thereafter, on December 22, 2005, Benninger filed the Claims Objection against

Cuneo.   After the parties conducted discovery, an evidentiary hearing was held and, after

consideration of the pleadings and the evidence, the Court requested additional briefs by the parties.

The matter is now ripe for determination.

## II.  ANALYSIS

In the Motion to Release Funds and the Claims Objection, Benninger asserts a myriad of

reasons as to why the Court should not allow any of the secured claims asserted by Cuneo.  The

objections raised by Benninger as to Cuneo's claim status include: (1) an objection contending that

the amount claimed by Cuneo for "services" are incorrect or otherwise  have been fully paid and

satisfied, (2) an objection contending that the amount claimed by Cuneo for "commissions" should

be disallowed because Cuneo was not the procuring cause of any sale of the annuities at issue, (3)

an objection contending that the charges forming the basis of Cuneo's claims are excessive and

redundant, (4) an objection contending that Cuneo's liquidated contractual claims and his

"unliquidated" claim sounding in tort fail(s) for want of proof,  and (5) an objection contending that,

even if Cuneo holds allowable claims, the putative lien interest that Cuneo has in the annuities is

unenforceable under applicable law.  Cuneo naturally disputes these objections.

The burden of proof for claims filed pursuant to 11 U.S.C. § 502(a) is a shifting one and rests

on different parties at different times. In re Allegheny Intern., Inc., 954 F.2d 167, 173-174 (3d Cir.

1992).   Under applicable law, the claimant must initially allege sufficient facts to support its claim

and, upon meeting this standard of sufficiency, the claim is *prima facie* valid.  Id. Upon objection

to the claim, the burden then shifts to the objecting party to produce evidence sufficient to negate

the *prima facie* valid claim.  Id.  If the objector produces sufficient evidence to negate one or more

of the sworn facts in the proof of claim, the burden then reverts back to the claimant. Id. The

claimant must then prove the validity of the claim by a preponderance of the evidence. Id.  In the

matter *sub judice*, Benninger produced sufficient evidence negating the *prima facie* validity of

Cuneo's claims, and at trial Cuneo failed to prove the validity of his claims by the preponderance

of the evidence.  Consequently, for the reasons set forth below, an Order will be entered which

disallows his claims *in toto*.

### A.

Proofs of Claim Nos. 6, 7, 8, 9,10,  12 and 13 are based on confessions of judgment obtained

by Cuneo against the Debtor.  Given the fact that the majority of Cuneo's claims arise out of

confessed judgments, it is important to recognize that certain principles which serve to safeguard

individual consumer debtor rights are relevant to this dispute.  In Swarb v.  Lennox, 405 U.S. 191,

92 S.Ct.  767 (1972), reh'g denied, 405 U.S. 1049, 92 S.Ct.  1303 (1972), the United States Supreme

Court held that confessed judgments, obtained as a result of consumer credit transactions with

individuals having income less than $10,000 annually, were unconstitutional absent a showing of

voluntary consent and waiver of rights by the individual consumer debtor.  While the income

amounts in Swarb v. Lennox  may now be outdated, the concern of an individual's informed consent

and waiver of rights remains present.  See  e.g., Jordan v.  Fox, Rothschild, O'Brien & Frankel, 20

F.3d 1250 (3d Cir.  1994).

In this case, Benninger did not dispute that she had signed the Agreement and certain of the

demand notes at issue.  However, she testified at trial that she did not have a strong recollection

and/or understanding of these documents.  The Court therefore has some concern as to whether

Benninger fully understood the terms of both the Agreement and the demand notes, and whether she

knowingly and voluntarily waived her due process rights.

For example, the confession of judgment clause in the Agreement is not conspicuous and the Agreement is difficult to comprehend even by a trained legal professional.[17]  At the evidentiary hearing on this matter, Benninger testified that at the time  she signed the Agreement, she was still on prescription medication.  Tr. at p. 127, lns. 23-25, p. 128, lns. 1-2.  Benninger testified that by November, 2000, she had moved into her brother's residence because she was unable to take care of herself and didn't know what she was doing.  Tr. at p. 137, lns. 4-5.  Benninger further testified that she did not specifically recall reviewing the Agreement with Cuneo but assumed that she did read it since she signed the document.  Tr.  at p. 124, lns. 15-19. Benninger also did not recall having any discussion with Cuneo regarding payment terms under the Agreement.  Tr.  at p.  125, lns.  2-11.  She testified that she did not know whether payments to Cuneo were to be based on an hourly charge or on a percentage basis.  Id.  Benninger further testified that she did not even recall having a conversation about the confession of judgment provision; nor did she recall whether Cuneo explained that he could obtain a judgment against her and her property without affording Benninger the prior opportunity to have her case heard before a court of competent jurisdiction.  Tr.  at p.  127, lns.  2-7.  Simply stated, the evidence in this case is that Benninger did not understand the

---

[17]  Cuneo's confession of judgment(s) against Benninger appears to be suspect in many respects.  For example, the confession of judgment clause found at ¶ 33.e is not conspicuously drafted. Lincoln Bank v. C& H Agency, Inc., 456 A.2d 136 (Pa. 1982).  In addition, while Cuneo has confessed judgment against Benninger on multiple occasions, the warrant of attorney contained in the Agreement does not appear to permit Cuneo to confess judgment repeatedly.  See Agreement at¶ 33.e.  Pennsylvania law does allow for successive judgments to be confessed on the basis of a single instrument but only where the instrument so provides.  See Pa.R.C.P. 2953(a). Questions also abound as to whether the commission amounts for which Cuneo confessed judgment were ascertainable from the Agreement.  Under Pennsylvania law, the instrument must state with certainty the amount of the obligation to be confessed.  See Std. Pa. Practice § 67.32.  Finally, there is no evidence in the record of any meaningful breach or default by Benninger at the time the judgments were confessed.  Where the instrument requires default or breach prior to the confession, judgment cannot be entered prior to the occurrence of the condition or limitation. Dollar Bank Fed. Sav. Bank v. Northwood Cheese Co., Inc., 637 A.2d 309 (Pa. Super. 1994).

Agreement's confession of judgment provision and that she was giving up a right to a hearing before

any judgment could be entered by Cuneo against her.  Tr. at p. 127, lns. 8-15.  It is in this context

that the Court considers the judgments by confession obtained by Mr. Cuneo.

In Pennsylvania, confessions of judgment for money are governed by Pa. R.Civ.P. 2950. [18]

Confessions of judgment are not authorized actions against a natural person for consumer credit

transactions. Pa.R.Civ.P. 2950.  A consumer credit transaction is a transaction where credit, services

or property  is offered or extended to a person for personal, family or household purposes.  Id.  The

alleged "services" provided by Cuneo under the Agreement related to matters concerning

Benninger's affairs, such as her delinquent residential mortgage loan, her delinquent car loan, the

eviction of a person residing at her personal residence, and the sale of her interests in the annuity

funded structured settlement.  The "services" Cuneo agreed to provide in this case were clearly for

a personal, family or household purpose.  As such, it appears that the transaction between the parties

was the very type of transaction intended to be excluded by the rules regarding confessions of

judgment.  Thus, it appears that Cuneo's use of confession of judgment is unlawful.

Nevertheless, it has been held that a judgment by confession in Pennsylvania is a final

judgment that is not ordinarily subject to collateral attack.  Zhang v.  Southeastern Fin.  Group, Inc.,

---

[18] Pa.R.C.P 2950 provides as follows:

As used in this chapter

"action" means a proceeding to enter a judgment by confession for money pursuant to an
instrument, other than an instrument executed by a natural person in connection with a consumer
credit transaction, authorizing such confession.

   *Note:* The action is abolished insofar as it would apply to a confession of judgment which is part
   of an instrument executed in connection with a consumer credit transaction.

"consumer credit transaction" means a credit transaction in which the party to whom credit is
offered or extended is a natural person and the money, property or services which are the subject
of the transaction are primarily for personal, family or household purposes.

980 F.Supp. 787 (E.D. Pa. 1997). In most circumstances, a confessed judgment must therefore be

challenged by the judgment-debtor filing a petition to open or strike the judgment pursuant to

Pa.R.Civ.P. 2959. However, the fact that the judgment-debtor petitioned for bankruptcy adds an

additional level of complexity regarding the allowability of Cuneo's judgment based claims.

Numerous provisions in the Bankruptcy Code vest a bankruptcy court with the authority to

review judgment based claims and the associated priority of the debt associated with them. The

applicable provisions of the Bankruptcy Code include: 11 U.S.C. § 502(b)(1)(providing that a claim

is allowed, except to the extent that "such claim is unenforceable . . . under any agreement or

applicable law"), 11 U.S.C. § 502(d)(providing that the court can disallow claims held by transferees

of avoidable transfers); 11 U.S.C. § 506(a)(providing that the court can determine the amount of

a "secured claim to the extent of the value of such creditor's interest" in estate property); 11 U.S.C.§

506(c)(providing that "to the extent that a lien secures a claim against the debtor that is not an

allowed secured claim, such lien is void, . . .), 11 U.S.C. § 510(c)(1)(providing that the court can,

"under the principles of equitable subordination, subordinate for purposes of distribution all or part

of an allowed claim"), 11 U.S.C. § 510(c)(2)(providing that the court can "order that any lien

securing such a subordinate claim be transferred to the estate"), and 11 U.S.C. § 105(a)(providing

that the "court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of" the Bankruptcy Code).

In addition, the United States Supreme Court has recognized that by filing a claim against

the bankruptcy estate, a creditor triggers the process of "allowance and disallowance of claims,"

thereby subjecting the creditor to the bankruptcy court's equitable power. See Langencamp v. Culp,

498 U.S. 41, 44-45 (1990)(citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 58-59 and n. 14

(1989) and <u>Katchen v. Landy</u>, 382 U.S. 323, 336 (1966)).  Indeed, in <u>Pepper v. Litton</u>, the United

States Supreme Court allowed a debtor to challenge a state court judgment in bankruptcy court on

the ground that a confessed judgment obtained by fraud was void *ab initio* for procedural reasons.

<u>Pepper v. Litton</u>, 308 U.S. 295, 301-303 (1939).  The United States Supreme Court has also held:

"It is one of the fundamental principles upon which equity jurisprudence is founded, that before a

complainant can have standing in court he must first show that not only has he a good and

meritorious cause of action, but he must come into court with clean hands."  <u>Keystone Driller Co.</u>

<u>v. General Excavator Co.</u>, 290 U.S. 240, 244 (1933)

This Court sees no reason why applicable Supreme Court precedent should not apply in this

case to disallow Cuneo's claims.  The Court reaches this conclusion because it is apparent that the

judgments confessed by Cuneo against Ms. Benninger were unlawful.  As one court wrote: "[n]o

Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."

<u>Highland Tank & Mfg. Co. v. PS Intern. Inc.</u>, 393 F. Supp. 2d 348, 361 (W.D. Pa. 2005)(quoting

<u>Holman v. Johnson</u>, 98 Eng. Rep. 1120, 1121, 1 Cowp. 342, 343 (K.B. 1775)); <u>see also</u>  <u>Gaudiosi</u>

<u>v. Mellon</u>, 269 F.2d 873, 882 (3d Cir. 1959)("The doctrine (of unclean hands) is confessedly derived

from the unwillingness of a court, originally and still nominally one of conscience, to give its

peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral

sensibilities of the judge.  It has nothing to do with the rights or liabilities of the parties; indeed the

defendant who invokes it need not be damaged, and the court may even raise it *sua*

*sponte*.")(quoting <u>Art Metal Works v. Abraham & Straus</u>, 70 F.2d 641, 646 (2d Cir. 1934)(Hand,

J., dissenting), <u>cert. denied</u>, 293 U.S. 596); <u>see also</u> <u>New Valley Corp. v. Corp. Prop. Associates 2</u>

<u>and 3 (In re New Valley Corp.)</u>, 181 F.3d 517, 524-527 (3d Cir. 1999)(discussing the clean hands

00000271.WPD                                     -18-

doctrine in the context of bankruptcy claims).

### B.

With respect to the unclean hands of the claimant, it bears noting that what Cuneo executed upon in order to satisfy his judgments by confession were the annuity payments issued by First Colony. Pennsylvania, however, has adopted the Structured Settlement Protection Act, 40 P.S.§ 4001 *et seq*. (the "Act").

The Act provides, in pertinent part, that:

> . . . no transfer of structured settlement payment rights shall be effective and no structured settlement obligor or annuity issuer shall be required to make any payment to any transferee of structured settlement payment rights unless the payee has filed a petition requesting such transfer and the petition has been granted by final Order or Decree of a Court of competent jurisdiction.

See 40 P.S. § 4003(a). Courts interpreting the Act have concluded that the statute is designed to protect beneficiaries of structured settlements from being taken advantage of by others. In re Petition of Brie Hilton, No. 2005-2721, 2005 Pa. Dist. & Cnty. Dec. LEXIS 392 at *5 (2005). This conclusion is further supported by the fact that 40 P.S. § 4007 provides that a violation of the statute "shall be deemed a violation of . . . the Unfair Trade Practices and Consumer Protection Law."

In the matter before the Court, Cuneo alleges two things with respect to his secured status. One, he alleges that the Agreement purports to grant him a security interest in the annuities at issue. Two, he alleges that he is also secured by virtue of his execution of a garnishment against them. As to the former, the Court has no doubt that to the extent the Agreement conveys to Cuneo a security interest against the annuities,[19] the grant of the security interest violates 40 P.S. § 4003(a).

---

[19] The language of the Agreement is confusing, and it is not entirely clear that it does grant Cuneo a security interest in the annuities. In fact, the only grant contained in the Agreement states "[t]he party of the second

(continued...)

The Court reaches this conclusion because the Act unequivocally provides that a "transfer" for purposes of Section 4003 of the Act includes any "direct or indirect sale, assignment, pledge, hypothecation or other form of alienation, redirection or encumbrance made by a payee for consideration . . ." <u>See</u> 40 P.S. § 4002.  As to the latter, it also appears to the Court that a garnishment of the annuity would also be a "transfer" for purposes of the plain language of the Act.  This conclusion is particularly acute given the broad meaning of the word "transfer" under the Act and given the fact that a fundamental purpose of the confession of judgment by Cuneo was to "protect the annuity from infiltration." Tr. at p. 91, lns. 24-25, 92, p. 92 lns. 1-15.  As Mr. Cuneo testified at trial:

> Q:   Did you realize that once you confessed judgment against her that the judgment would become a lien on whatever real estate she owned in Butler County?
>
> A:    Yes, I did.
>
> Q:   Was that the purpose behind –
>
> A:   That was –
>
> Q:    – confessing judgment, doing that in lieu of actually having a mortgage recorded and filed?
>
> A:    Correct.  That – it operates that way, Your Honor.  And I also wanted to try and protect that annuity from any infiltration that would have maybe caused her a loss, you know, an unreasonable loss.

<u>Id</u>.  Consequently, for these reasons, the Court concludes that Cuneo's efforts to obtain an interest in the annuities were unlawful.

---

[19](...continued)

part grants to the party of the first part a security interest in the property described herein." Agreement, ¶16.  The failure of Cuneo to adequately identify his collateral also is fatal to his claimed security interest.  <u>See</u> <u>e.g.</u>, <u>In re Beransen</u>, 152 B.R. 427 (Bankr.  M.D.Pa.  1993).

*C.*

The Court also finds equally troubling the fact that the underlying basis of Cuneo's claims is dubious at best. When one reviews Cuneo's claims, it is quite apparent that a substantial amount of the charges for "services" as contained in Claim Nos. 6, 7, 8, and 10 are meritless. Those bogus charges include fees assessed for: (1) preparation of the Agreement itself, (2) matters relating to the sale of the Debtor's residence which should have been properly encompassed in the listing agreement, and (3) preparation and prosecution of illegal confessions of judgment against the Debtor.

Even if the "service" based claims sought by Cuneo had some basis in the Agreement, the Court nonetheless disallows them under the clean hands doctrine and for public policy reasons. The Court reaches this conclusion because it became apparent to the Court at the evidentiary hearing on this matter that Mr. Cuneo has engaged in the unauthorized practice of law.

In Pennsylvania, the unauthorized practice of law is statutorily prohibited pursuant to 42 Pa. C.S.A. §2524. The statute provides, in relevant part, that it is a misdemeanor of the third degree for any person "who, within this Commonwealth shall practice law . . .without being an attorney at law..." 42 Pa. C.S.A. §2524(a).

The phrase "practice of law" is not statutorily defined and courts have been reluctant to establish a specific definition of it. As the Pennsylvania Supreme Court has held: "Marking out the abstract boundaries of legal practice would be an elusive, complex task more likely to invite criticism than to achieve clarity." Dauphin County Bar Ass'n v. Mazzacaro, 351 A. 2d 229, 233 (Pa. 1976) citing Shortz v. Farrell, 190 A. 20, 21 (1937). Rather, each case is to be analyzed on the "particular judgment involved and the expertise that must be brought to bear on its exercise."

Id.

The standard for determining when an individual is practicing law is when the service requires legal knowledge, training, skill and ability beyond those possessed by the average person. Matter of Arthur, 15 B.R. 541 (Bankr. E.D. Pa. 1981). Consequently, the practice of law is not confined to services rendered in relation to a particular court proceeding. Id. at 545. Rather, the practice of law may also include other aspects of rendering legal advice regardless of whether a matter is pending in a court, such as preparing legal instruments and contracts which secure legal rights. Id.; In re Campanella, 207 B.R. 435, 446 (Bankr. E.D.Pa. 1997) ("Consequently, it is clear that preparation of pleadings and other types of legal papers and giving of advise in legal matters constitutes the practice of law because all of these activities require a familiarity with legal principles which are beyond a layperson's knowledge."); Shortz, 190 A. at 21 (one of the three principal ways in which a lawyer applies his knowledge is preparing documents requiring familiarity with legal principles beyond that of an ordinary laymen such as wills and those contracts which are not of a routine nature.)

At trial, Cuneo testified that he is a licensed  real estate appraiser.  He is not a licensed attorney.  Tr. at p. 84, lns. 10-15.[20]  The Agreement which forms the basis of Cuneo's claims was drafted by Cuneo.  In fact, he charged Benninger for approximately eighteen hours to draft this document, even though Benninger never agreed to bear the cost of preparation. Tr.  at p. 56, lns. 5-11; Debtor's Ex.  A, 7/11, 7/12, 7/13, 7/14 .

The Agreement called for Cuneo to render "advise and professional expertise for the purpose

---

[20] In a previous filing with the Court, Cuneo strongly advised of this fact when a sanction was imposed upon him pursuant to Local Rule 5005-1 for failure to file electronically.  The Court takes judicial notice of that filing at Document No.  74. Since the time of the Agreement and subsequent dispute, Cuneo apparently obtained a paralegal certificate on or about December 2001.  Id., Ex. pp. 4,5.  Such certificate is not a license to practice law.

of asset liquidation, debt consolidation and restructuring, investment or re-investment of capital in real, personal or business property." Agreement, ¶2. While these provisions appear to be somewhat ambiguous, the Agreement further required that Cuneo attend all meetings or legal proceedings relating to Benninger's interests. Id., ¶3. Cuneo was even "authorized to conduct and attend consultations, meetings, pre-trial conferences of legal proceedings" and to "attend and participate in litigation generally before any court of competent jurisdiction" on behalf of Benninger. Id., ¶8, ¶9, ¶10.

The facts of this case are such that Cuneo began charging Benninger for services relating to a variety of matters, many of which appear to be legal in nature. The fact that Cuneo charged Benninger $150 per hour for services, and billed at 1/10th of an hour increments, even creates the appearance of a bill for legal services.

One of the legal matters for which Cuneo provided "consultation" services was the mortgage foreclosure action against Benninger. For example, Cuneo testified at the evidentiary hearing regarding the legal flavor of his services as follows:

> Q:      . . . what did you do there?
>
> A:      What did I do there?  I went back through and I took a look at all of her mortgages to find out what people were doing because she was alleging to me that these people were coming to her with financial offerings that may have been predatory at the time.  Predatory lending.
>
> Q:      When you say these folks, you mean – you mean the Chase or whoever – whatever the lender was?
>
> A:      Yes.  The folks, yeah.  The people who has positions.  And I went back through the mortgage – I started a mortgage file and collected a couple of mortgages that were done by the Slippery Rock Federal Credit Union and then I believe someone by the name of Chase Manhattan – Chase

> Manhattan Bank of Texas, . . . but I know that . . . she was having a very bad time with a mortgage servicing company by the name of Meritech. Now, whenever we found that they were unwilling to even accept her payments, I tried to intervene in writing – by writing them or notifying them because they weren't taking the payments. . . .

Tr.  at p. 85-86.  He also testified:

> Q:      So, you think about September 29th, you met with her and strategized in terms of what to do . . . in response to the foreclosure complaint?
>
> A:      I think that's exactly what occurred.

Tr.  at p. 99, lines 22 - 25; p.100, lns. 1 - 7; <u>see also</u> Tr.  at p. 101, lns 18 - 25; p. 102, lns. 1 - 11

(advising the Debtor about what to do to "head off the mortgage foreclosure"); Tr. at p. 90, lns. 21 -

25 and Tr. at p. 91, lns. 5 - 10 (advising the Debtor as to the various foreclosure papers, including

the Act 91 notice).

The undisputed record in these proceedings also reflects  that Cuneo was acting as a *de facto*

insolvency lawyer for Benninger because he was negotiating and/or advising Benninger with respect

to the workout of delinquent loans.  His testimony before the Court included:

> Q:      So, you put together some sort of forbearance plan - -
>
> A:      Yeah.
>
> Q:      - - and you sent it to the lender to try to do a workout of some sort - -
>
> A:      Right.
>
> Q:      - - so that she could keep the home - -
>
> A:      Right.
>
> Q:      - - and avoid foreclosure.

Tr. at p. 87, lns. 1 - 8. Towards this end, Cuneo negotiated on behalf of Ms. Benninger the return of collateral in lieu of repossession with various creditors, and Mr. Cuneo even prepared various forms in this regard on her behalf. <u>See</u> Tr. at p. 87, lns. 15 - 25; p. 88, lns. 1 - 25.

The fact of the matter is that Cuneo undertook actions to contact Benninger's creditors to negotiate forbearance plans all the while, during that time, Benninger's mortgagee obtained a judgment in foreclosure. Tr. at pp. 85-87. The Court is unsure as to whether any of the activities actually benefitted Benninger, and the Court suspects that they did not.[21]

Cuneo's legal services extended beyond mortgage foreclosure and loan workout matters. By way of example, Cuneo's services also included landlord/tenant advice with respect to the eviction of an "undesirable individual" residing on the Debtor's property. Cuneo testified:

> A:     …She [Benninger] was involved with a gentleman [ . . . and] became disfavored with him and wanted him evicted from the residence because I believe he was boarding there or rooming there at the time. She was not really too well informed about how to have someone removed from her residence.…

Tr. at p. 9, lns. 1 - 8. Cuneo also stated:

> Q:     What about this notice to remove, what is that?
>
> A:     That was a notice to remove where she had become disgruntled with the fellow who she was involved with . . .
>        . . .
>
> A:     Oh, yeah, I prepared the notice to quit and I got - - got her to get it signed. Told her how to go about getting it served and told her how to go about getting a copy to the police barracks in Butler.

Tr. at p. 92, lns. 16-25 and Tr. at p. 93, lns. 21 - 24.

---

[21] <u>See</u> 11 U.S.C. § 502(b)(4), which disallows claims filed by attorneys and/or insiders of a debtor where such claims exceed the reasonable value of such services.

In addition, when Benninger ceased doing business with Peachtree, Cuneo intervened and attempted to negotiate an amicable settlement between Peachtree and Benninger. Specifically, when Peachtree was pursuing a possible transaction with Benninger, Peachtree advanced to Benninger $6,000 in anticipation of Benninger closing the annuity sale with Peachtree. However, when Peachtree determined not to proceed with the transaction because of the nuances of Pennsylvania law relating to the sale of structured settlements, Peachtree requested that Benninger repay the advance previously made by Peachtree. When no agreement was reached with Peachtree, Cuneo interceded and even performed the lawyerly function of preparing a letter of recision on behalf of his putative client. Tr. at p. 11, lns. 9-18.

Regarding the transfer of the annuity payments, Cuneo, on his cross examination of Benninger, suggested that he helped Benninger "understand better" what she might be entitled to under her annuity. [22] Apparently Cuneo was advising Benninger of her rights and obligations under the annuity in this regard, even though Cuneo is no lawyer.

There is an old phrase: "if it walks like a duck, talks like a duck, then it is a duck." For all intents and purposes, it appears to the Court that Cuneo's conduct, behavior and manner of providing services to Benninger constituted the unauthorized practice of law.

There is a public policy interest in ensuring that only those authorized and qualified to provide legal services be permitted to provide such services. The Supreme Court of Pennsylvania, in Shortz v. Farrell, 193 A. 20, 24 (Pa. 1937) stated:

> While in order to acquire the education necessary to gain admission to the bar and thereby become eligible to practice law, one is obliged to "scorn delights, and live laborious days," the object of the legislation forbidding practice to laymen is not to secure to lawyers

---

[22] Tr. at p. 133, lns. 22-25; p. 134, lns.1-2.

a monopoly, however deserved, but, by preventing the intrusion of inexpert and unlearned person in the practice of law, to assure to the public adequate protection in the pursuit of justice, than which society knows no loftier aim.

In Dauphin County Bar Ass'n v. Mazzacaro, 351 A.2d 229, 232 (Pa. 1976), the Supreme Court of Pennsylvania stated that a person who holds himself out as competent to exercise legal judgment "... implicitly represents that he has the technical competence to analyze legal problems and the requisite character qualifications to act in a representative capacity." Danger to the public is evident when those representations are made by those not adequately trained or regulated. Id.

In addition to Pennsylvania law proscribing that the unauthorized practice of law is a misdemeanor, Pennsylvania courts also adhere to the principle that an illegal or unlawful contract will not be enforced. Holst v. Butler, 108 A.2d 740 (Pa. 1954) (citations omitted) ; Am. Ass'n of Meat Processors v. Casualty Reciprocal Exchange, 588 A.2d 491 (Pa. 1991)("the courts of this Commonwealth will not be used to enforce contracts which violate public policy; such contracts are void and the law will have nothing to do with them.") Because the unauthorized practice of law is illegal as violative of a Pennsylvania statute and public policy, this Court concludes that the Agreement between Cuneo and Benninger is void under Pennsylvania law. Dippel v. Brunozzi, 74 A.2d 112,114 (Pa. 1950)(an agreement which violates a provision of a statute or which cannot be performed without violating such provision, is illegal and void). Having determined that the Agreement entered into between the parties is not a lawful one, it logically follows that any judgment based claims filed by Cuneo relating to the same are similarly disallowed by the Court. F.F. Bollinger Co., v. Widmann Brewing Corp., 14 A.2d 81 (Pa. 1940)(corporation could not recover for architectural and engineering services rendered where plans not prepared by architect or engineer.); Bauman and Vogel, C.P.A. v. Del Vecchio, 423 F.Supp 1041 (E.D. Pa.

1976)(recovery under contract for accounting services would not be enforced where accounting firm violated CPA law during period of contract.).

### D.

The Court also finds that Claim Nos. 9, 12, and 13 are lacking a substantive basis, which is further evidence of the claimant's unclean hands.[23]  Pursuant to these claims, Cuneo seeks to be paid a 7% commission with respect to Benninger's sales of annuities to Settlement Capital.  These claims aggregate $87,435.09, of which $28,850.77 represents a 7% commission on the transactions that actually occurred between Benninger and Settlement Capital and $58,584.32 represents additional alleged commission due Cuneo as a result of an alleged "loss of bargain."  As to the latter, Cuneo apparently believes that Benninger short changed herself (i.e., sold the annuities for a price that was too low) when she sold her annuities to Settlement Capital.  In this regard, Cuneo alleges he "could have" obtained for Benninger a better price, and Cuneo therefore seeks commissions based upon a hypothetical sale that never materialized.

The Court disallows these claims *in toto*.  As an initial matter, the Court disallows the commission based claims on the basis that the transaction between Cuneo and Benninger did not comply with the disclosure and other requirements set forth in the Structured Settlement Protection Act, 40 P.S.§ 4001 *et seq*.  As a result, Cuneo's claims in this regard are nugatory.  In addition, as set forth above, the Agreement is void.

Even if the Structured Settlement Protection Act does not apply (and even if the Agreement is divisible in such a way that the void provisions of the agreement could be severed), the commission based claims filed by Cuneo are nonetheless disallowed.

---

[23] None of the claims filed at claims numbers 11, 12, 13 and 14 formed a basis of Cuneo's alleged garnishment lien, as the garnishment purportedly occurred prior to the entry of these judgments.

In Pennsylvania, the law relating to when a broker is entitled to a commission is well established. First, there must be a contract of employment. <u>Strout Realty, Inc. v. Haverstock</u>, 555 A.2d 210 (Pa. Super. 1989). Second, the broker must then present a purchaser who is ready, willing and able to purchase on terms that are satisfactory to the seller. <u>Id</u>. at 212 (citations omitted). Merely conducting negotiations with the prospective buyer does not entitle a broker to a commission unless the broker's efforts were the "efficient procuring cause of sale." <u>Id</u>. <u>quoting</u> <u>Axilbund v. McAllister</u>, 180 A.2d 244 (Pa. 1962). <u>See</u> <u>also</u> <u>Helmig v. Rockwell Mfg. Co.</u>, 111 A. 2d 118 (Pa. 1955).

The facts are, however, that Cuneo did not procure the transaction with either Peachtree or Settlement Capital. Rather, Benninger had contacted Peachtree prior to meeting Cuneo. It was Peachtree, and not Cuneo, that ultimately referred Benninger to Settlement Capital. Nor did Cuneo negotiate or procure the final transfer price. In addition, the transfer from Benninger to Settlement Capital required court approval of which Cuneo had no involvement. Rather, the only involvement Cuneo had with the transaction was in the physical preparation of the application, which was nothing but a clerical endeavor. Because the record does not show that the cash proceeds received by Benninger were the result of any alleged service performed by Cuneo, Cuneo's commission based claims are disallowed.

The Court further notes that at the hearing on the Claims Objection, Cuneo was asked to point to a contractual basis supporting his commission based claims, including his claims based on "loss of bargain." Cuneo asserted entitlement to recover a claim based upon a "loss of bargain" pursuant to Paragraph 33.d of the Agreement. Tr. at p. 108, lns. 13-21.[24] Paragraph 33.d, however,

---

[24] Paragraph 33.d of the Agreement states as follows:

(continued...)

is an *ipso facto* provision in the Agreement, and courts have construed those provisions as being

unenforceable.  See e.g., In re Beck, 272 B.R. 112 (Bankr. E.D.Pa. 2002); Matter of Triangle

Laboratories, Inc., 663 F.  2d 463 (3d Cir.  1981).

Even if Paragraph 33.d is enforceable, this provision of the Agreement does not provide

recourse for Cuneo.  A cursory review of the Agreement indicates that any broker arrangement

between Cuneo and Benninger was not an exclusive one.  Because the agreement was not exclusive,

Benninger was free to sell the annuities on her own or with the assistance of other brokers (all

subject to the Structured Settlement Protection Act).   Benninger should not be penalized for the

Agreement's lack of exclusivity.

Cuneo mis-reads Paragraph 33 as giving him the right of a "loss of bargain" if Benninger

transfers her rights under the annuities without his consent.  In essence, Cuneo re-engineers the

Agreement to provide him with an exclusive brokerage arrangement.  The Court will not construe

the Agreement in such a way.  The contract is a convoluted agreement, is not written in plain

English, and the Court construes it against the drafter- i.e., Mr. Cuneo. Franklin Interiors v. Wall of

---

[24](...continued)
If during the term or any subsequent term under this agreement, the party of the second part shall
be adjudicated a bankrupt, or make a general assignment for the benefit of creditors, or to take the
benefit of any insolvency act, or if a permanent receiver or trustee in bankruptcy be appointed for
the property or financial interest, or if a temporary receiver be appointed for the property or
financial interest, and such appointment of a temporary receiver be not vacated and set aside
within 90 days of said appointment, or in the event of any attempted transfer or other devolution of
the interests in the property or any part thereof of the of the party of the second party to any other
person, corporation or legal entity by reason of the several acts of the party of the second part to
avoid or dishonor payment of outstanding balances arising under the foregoing terms, conditions
and understandings as more fully set forth herein, then in the event of any such default or breach of
agreement by the party of the second part, the party of the first part shall have the right to declare
the entire outstanding balance immediately due, and shall be entitled to additional sums under the
theory of loss of bargain as same nay be construed or defined under statutory or common law.  The
party of the first part shall thereafter be entitled future consequential damages that are to be
computed form the average aggregated fees charged or paid under th terms, conditions,
descriptions and understandings set forth in this agreement.

<u>Fame Mgmt. Co., Inc.</u>, 511 A.2d 761, 763 (Pa. 1986).

The fact of the matter is  that, under best case scenario for Cuneo, the Agreement gives him a right to pursue "loss of bargain" if Benninger transfers her "property" to "avoid or dishonor payment of outstanding balances**...**" <u>See</u> Agreement at ¶ 33.d.  Nothing exists in the record which suggests that Benninger transferred the annuities to Settlement Capital with the purpose of avoiding any of her alleged liabilities to Cuneo.  Rather, a fair reading of the record is that Paragraph 33.d of the Agreement was never triggered by Benninger's sale because Benninger actually had no legally cognizable obligations whatsoever to Cuneo.  Alternatively any debts payable by Benninger to Cuneo were unlawful as being violative of the Structured Settlement Protection Act and Pennsylvania's proscription against the unauthorized practice of law.  Under these circumstances, the Court finds that none of the "loss of bargain" provisions of Paragraph 33.d of the Agreement have been triggered.

Furthermore, with respect to the claims filed by Cuneo at Claim Nos. 12 and 13, these two claims are premised on a commission right based on a "loss of bargain" theory measured against a hypothetical sale that never occurred.  The face of the claims do not state, explain or in any way suggest the legal and factual basis of these claims, and the testimony of Cuneo at the evidentiary hearing was not helpful in this regard.  Absent an adequate explanation on the record, and absent competent evidence supporting these claims, one is left to divine the genesis of them.   Cuneo therefore has not met his burden of production and persuasion with respect to these claims and they are disallowed. <u>See</u> <u>Brisbin v.  Superior Valve Co</u>., 398 F.3d 289 (3d Cir.  2005)(<u>citing</u> <u>Delahanty v.  First Pennsylvania Bank, N.A.</u>, 464 A.2d 1243, 1258 (Pa. Super. 1983)("Though damages for lost profits can be given, they cannot be recovered where they are merely speculative."); <u>Barrows v. Forest Laboratories, Inc.</u>, 742 F.2d 54, 60 (2d Cir.  1984)( "A claim for benefit-of-the-bargain

damages must be based on the bargain that was actually struck, not on a bargain whose terms must

be supplied by hypotheses about what the parties would have done if the circumstances surrounding

their transaction had been different.").[25]

In addition to the above, alternative grounds of disallowance of Claim Nos. 9, 12 and 13

exist.  Claim No. 9 is supported by an alleged judgment entered on April 30, 2002.  The Debtor's

bankruptcy was filed on August 29, 2005.  While the judgment supporting Claim No. 9 would not

fall within the ninety (90) day preference period of 11 U.S.C. §547, it does fall within the four year

lookback period proscribed by the Pennsylvania Uniform Fraudulent Transfer Act.  12 Pa.C.S.A.

§5109; 11 U.S.C. § 544.  Because the April 30, 2002 judgment was entered when Benninger was

insolvent, and because Cuneo provided no consideration recognizable at law prior to the entry of the

same, it appears to the Court that the judgment was a fraudulent transfer.  see e.g., In re Walter, 261

B.R. 139 (Bankr. W.D. Pa.  2001).

Similarly, it appears to the Court that Claim Nos. 12 and 13 were reduced to judgment on

August 15, 2005, which is a time period within two (2) weeks of the Debtor's bankruptcy filing.  To

the extent any such judgments operate as a lien against any assets of Benninger, or to the extent the

entry of the judgments operate to erase any contractual rights or defenses of Benninger, the

judgments are also avoidable under the preferential transfer provisions of the Bankruptcy Code. See

11 U.S.C. § 547; see e.g. In re Derrick, 190 B.R. 346, 355 (Bankr. W. D. Wis. 1995)(discussing the

notion that if a judgment ripens into a lien on eve of bankruptcy, such judgment lien is an avoidable

preferential transfer); see also Wallach v. Nowak,  et al. (In re Sherlock Homes of W.N.Y., Inc.),

---

[25]  It has been determined that Cuneo was not the procuring cause of any sale, and therefore he is not
entitled to any commission.  Cuneo's claims at Claim No. 12 and Claim No. 13 seek payment on a hypothetical sale
that never transpired.   These claims are nothing but overreaching by the claimant as there is no basis in the
Agreement for commission on amounts not received by Benninger!  The claimant appears to want to "have his cake
and eat it too."

246 B.R. 19 (Bankr. W.D.N.Y. 2000)(termination of contractual rights on eve of bankruptcy filing was a transfer for purposes of avoidance) and In re e2 Communications, Inc., 320 B.R. 849 (Bankr. N.D.Tex. 2004)(release of corporate debtor's claims against former director was a transfer).  The judgments supporting Claim Nos. 12 and 13 would also be deemed fraudulent transfers by the Court because Benninger was insolvent when they were entered, and Cuneo did not provide anything of reasonably equivalent value to Benninger in return (as, in-fact, Cuneo was not the procuring cause of Benninger's sale of the annuities to Settlement Capital).

11 U.S.C. § 502(d) provides that "the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a)" of the Bankruptcy Code.  Because the judgments in favor of Cuneo are avoidable, the claims of Cuneo at Claim Nos. 9, 12 and  13 are disallowed by operation of Section 502(d) of the Bankruptcy Code. See e.g. In re America West Airlines, Inc., 217 F.3d 1161 (9th Cir. 2000)(holding that Section 502(d) disallowance is proper even if statute of limitation has expired with respect to avoidable transfer); In re McLean Indus., Inc., 196 B.R. 670 (S.D.N.Y. 1996)(same); In re Loewen Group Int'l, Inc., 292 B.R. 522 (Bankr. D. Del. 2003); In re Enron Corp., 340 B.R. 180 (Bankr. S.D.N.Y. 2006).

### E.

Claim No. 11 in the amount of $387.88 represents a $100.00 judgment, plus interest, against Benninger for her alleged failure to pay a court ordered sanction in the form of "counsel fees" to Cuneo.  Cuneo alleges that this "sanction" was imposed against Benninger in an action filed by Cuneo against Benninger in Butler County.  Benninger does not deny the basis of the claim but disputes that any amount is due.  Benninger asserts that the sums Cuneo has collected as a result of his execution on the confessed judgments are sufficient to have paid this claim.  The Court agrees,

and finds that (a) Benninger has paid Cuneo in excess of $23,000 on account of the claims of Cuneo

and that (b) such sums paid far exceed the alleged "sanction" claim. Because Claim No. 11 has been

paid in full, the claim filed by Cuneo at Claim No. 11 is disallowed.

### *F.*

Pursuant to the proof of claim filed at Claim No. 14, Cuneo seeks the allowance of an

unliquidated claim based on a lawsuit pending in the Court of Common Pleas of Butler County at

2003-10409. The continued prosecution of this lawsuit has been enjoined by the automatic stay.

The civil complaint forming the basis of Claim No. 14 was not put into evidence in this

matter, but Cuneo did advise the Court that the lawsuit is comprised of six (6) counts of tort. The

Court is unaware of the basis of the tort causes of action or the status of the pending lawsuit because

Cuneo failed to present any evidence regarding the substantive merits of his alleged causes of action.

Having completely failed to do so, Cuneo has failed to adequately support this claim and

accordingly Claim No. 14 is disallowed.

### III **CONCLUSION**

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law

pursuant to Fed.R. Bankr. P. 7052. It appears to the Court that at the time Benninger met Cuneo,

Benninger was in a state of emotional as well as financial turmoil. She had lost her severely

disabled son, Jayson, that she had cared for for eighteen years. Upon her son's death, Benninger was

grief stricken and vulnerable. As this Court views it, upon learning of Benninger's circumstances,

Cuneo devised a mechanism by which to profit from her unfortunate circumstances. In so doing,

Cuneo took advantage of Benninger's vulnerabilities, lack of sophistication and education. In

Cuneo's own words, it was a "comprehensive scheme" - a characterization with which this Court

would agree. For the reasons expressed above, sufficient grounds exist to disallow each of the

proofs of claim filed by Cuneo.  These grounds include, but are not limited to, the unclean hands of

Mr. Cuneo.  As a result of this Court's determination, the Court will enter an order which (a)

sustains the Claims Objection, and (b) grants the Motion to Release Funds.


Dated: December 18, 2006                    /s/     Jeffery A. Deller_____
                                            Jeffery A.  Deller
                                            U.S. Bankruptcy Judge



cc:     Albert E.  Cuneo
        5245 Baptist Road
        Pittsburgh, PA 15236

        Gary H. Simone, Esq.
        Rishor Simone
        101 E.  Diamond Street
        Suite 208
        Butler, PA 16001

        Ronda J.  Winnecour, Esq.
        Suite 3250 US Steel Tower
        600 Grant Street
        Pittsburgh, PA 15219

        Christopher C.  Rulis, Esq.
        O'Brien, Rulis, Bochicchio & Sosso, LLC
        DDI Plaza One, Suite 300
        1225 Washington Pike
        Bridgeville, PA 15017

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JODY BENNINGER ,** | : | **Bankruptcy No. 05-31181 JAD** |
| | : | |
| **Debtor.** | : | **Chapter 13** |
| ****************************************** | **X** | |
| | : | |
| **JODY BENNINGER,** | : | **Related to Document No.  43** |
| | : | |
| **Movant,** | : | |
| | : | |
| - vs - | : | |
| | : | |
| **FIRST COLONY LIFE INSURANCE** | : | |
| **COMPANY, COMMONWEALTH OF** | : | |
| **PENNSYLVANIA MEDICAL** | : | |
| **PROFESSIONAL LIABILITY** | : | |
| **CATASTROPHE LOSS FUND, ALBERT E.** | : | |
| **CUNEO, and RONDA J.  WINNECOUR,** | : | |
| **Chapter 13 Trustee.** | : | |
| | : | |
| **Respondents.** | : | |
| | : | |
| ****************************************** | **X** | |
| | : | |
| **JODY BENNINGER,** | : | **Related to Document No.  65** |
| | : | |
| **Movant,** | : | |
| | : | |
| - vs - | : | |
| | : | |
| **ALBERT E.  CUNEO,** | : | |
| | : | |
| **Respondent.** | : | |
| ****************************************** | **X** | |

**ORDER OF COURT SUSTAINING OMNIBUS OBJECTION**
**TO ALL PROOFS OF CLAIM FILED BY  ALBERT E.  CUNEO**
**AND GRANTING MOTION TO RELEASE FUNDS**

**AND NOW**, this **18**[th] day of **December, 2006**, for the reasons expressed in the Memorandum

Opinion Sustaining Omnibus Objection to All Proofs of Claim Filed by Albert E.  Cuneo and

00000271.WPD

Granting Motion to Release Funds, it is hereby **ORDERED, ADJUDGED** and **DECREED** that:

1.  The Omnibus Objection to All Proofs of Claim Filed by Albert E.  Cuneo is
    **SUSTAINED** and the  proofs of claim filed by Albert E.  Cuneo at Claim Numbers
    6, 7, 8, 9, 10, 11, 12, 13, and 14 are **DISALLOWED**.   By operation of 11 U.S.C.
    § 506(d), the Court further Orders that the lien interest alleged by Mr. Cuneo is
    **VOID**.

2.  The Motion to Release Funds Held by First Colonial Life [sic] is **GRANTED** and
    First Colony Life Insurance Company shall release the funds presently held on behalf
    of Debtor Jody Benninger and proceed with future remittances to the Debtor.


December 18, 2006                           /s/ Jeffery A. Deller
                                            Jeffery A.  Deller
                                            U.S. Bankruptcy Judge



cc:    Albert E.  Cuneo
       5245 Baptist Road
       Pittsburgh, PA 15236

       Gary H. Simone, Esq.
       Rishor Simone
       101 E.  Diamond Street
       Suite 208
       Butler, PA 16001

       Ronda J.  Winnecour, Esq.
       Suite 3250 US Steel Tower
       600 Grant Street
       Pittsburgh, PA 15219


       Christopher C.  Rulis, Esq.
       O'Brien, Rulis, Bochicchio & Sosso, LLC
       DDI Plaza One, Suite 300
       1225 Washington Pike
       Bridgeville, PA 15017


00000271.WPD                            2